# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IT'S INTOXICATING, INC., | : | |
| Plaintiff, | : | Civil No. 11-CV-2379 |
| v. | : | |
| MARITIM HOTELGESELLSCHAFT mbH and DANIELA ZIMMER, | : | (JUDGE MANNION) |
| Defendants. | : | |
| | : | |

## MEMORANDUM

Before the court are two consolidated motions filed by defendants Maritim Hotelgesellschaft and Daniela Zimmer, (Doc. No. 23; Doc. No. 32), seeking dismissal of plaintiff's fraud, breach of contract, unjust enrichment, and conversion claims pursuant to Federal Rule 12(b)(6). (Doc. No. 21.) Defendants also move to challenge this court's exercise of personal jurisdiction over defendants Zimmer and Maritim pursuant to Rule 12(b)(2) and venue pursuant to Rule 12(b)(3) and 28 U.S.C. §1391(b). (Doc. No. 23; Doc. No. 32.) Plaintiff refutes defendants' claim that the court lacks jurisdiction but requests, in the alternative, that the court transfer this matter to the District of New Jersey if the court determines that it cannot exercise personal jurisdiction over the parties. (Doc. No. 33, at 7.) Because jurisdiction and venue are appropriate here, the court will proceed to decide the motion on the merits of plaintiff's complaint. After a thorough review of the record and, viewing the factual allegations of the complaint in the light most favorable

to the non-moving party, the court will **GRANT IN PART** and **DENY IN PART** the motion.

## BACKGROUND

Plaintiff, It's Intoxicating Inc., is a Pennsylvania corporation located in Forty-Fort that manufactures and distributes cosmetic products to various retailers. (Doc. No. 21, at 1.) Defendant Maritim is a German company with a primary business address in Bad Salzuflen but owns hotels throughout Germany. (Doc. No. 21, at 1.) Defendant Zimmer is an individual living in Berlin, Germany, and, as plaintiff alleges in the complaint, is an employee of Maritim who has purportedly been delegated the authority to purchase beauty products on behalf of Maritim. (Doc. No. 21, at 1.)

On October 5, 2007, defendant Zimmer contacted plaintiff by e-mail and explained that Maritim was looking for beauty products to use in several of its hotels. (Doc. No. 21, at 1,2.) Plaintiff responded via e-mail the same day, providing price lists as well as pictures of the products in which Zimmer expressed interest. (Doc. No. 21, at 2.) On October 11, 2007, Zimmer called plaintiff and asked how long it would take to manufacture and assemble a shipment of specified products if Maritim decided to place an order. (Doc. No. 21, at 2.) Plaintiff responded that same day with information regarding manufacturing and shipping times of various products and also asked Zimmer in an e-mail, three days later, whether Maritim would like assistance forecasting product demand for its hotels. (Doc. No. 1, at 2.)

The parties continued their discussions until October 19, 2007, when Zimmer called to inform plaintiff that Maritim wished to buy its products for use in thirty-eight of its hotels. (Doc. No. 21, at 3.) Zimmer requested that several of plaintiff's products be sold exclusively to Maritim, (Doc. No. 21, at 3), so plaintiff provided Zimmer a twelve month "Exclusivity Agreement," which the parties subsequently agreed to lengthen to eighteen months at the request of Maritim's CEO. (Doc. No. 21, at 3.) Plaintiff also sent via e-mail a document titled "Conditions of Sale," a proposed agreement purporting to govern various collateral aspects of the parties' developing relationship. (Doc. No. 21, at 3.) That document stated:

> This agreement will be governed by and construed in accordance with the laws of the state of Pennsylvania, United States of America. The parties hereto hereby consent to the exclusive jurisdiction and venue of the United States District Court for Luzerne County for any action that may be brought in connection with this agreement and/or from the use of the Aromapro software and/or from the use of the Aromapothecary products. (Doc. No. 21, at 3.)

On October 22, 2007, plaintiff provided Zimmer price lists for its products, and Zimmer responded by asking plaintiff the "suggested retail prices Maritim should charge [its customers]." (Doc. No. 21, at 4.) Plaintiff also requested an estimate of Maritim's order, but Zimmer explained that Maritim's CEO was currently assessing the company's requirements. (Doc. No. 21, at 4.) Six days later, on October 29, 2007, plaintiff discussed with Zimmer the exact quantity of goods required by Maritim's hotels. (Doc. No. 21, at 4.)

3

Defendant Zimmer followed this call with an e-mail stating that she would send a purchase order and deposit soon. (Doc. No. 21, at 5.)

The parties continued to communicate in the coming weeks about Maritim's confidential sales numbers, payment details, delivery estimates, and further amendments to the exclusivity agreement. (Doc. No. 21, at 5.) On November 24, after revising the exclusivity agreement for the second time, plaintiff requested guidance from Maritim as to whether an order of goods by another German company conflicted with the party's exclusivity agreement. (Doc. No. 21, at 5.) Zimmer looked into the potential agreement, concluded that there was no conflict, and advised plaintiff it could proceed with the sale. (Doc. No. 21, at 5-6.) On December 1, 2007, plaintiff received the amended exclusivity agreement, signed by the CEO of Maritim. (Doc. No. 21, at 6.)

On December 14, 2007, Zimmer called plaintiff to ask if plaintiff had begun manufacturing the products requested in the order. (Doc. No. 21, at 6.) Plaintiff responded that it had not yet received a purchase order from Zimmer but that materials had been ordered and production begun. (Doc. No. 21, at 6.) On January 14, 2008, plaintiff finally received the purchase order and later that month received another order, this time for the Timmendorfer, one of Maritim's individual hotels. (Doc. No. 21, at 6.)

On March 3, 2008, plaintiff shipped 441 cartons of beauty products on eight skids to Maritim Hotel Dusseldorf, one of defendant's hotels located in Dusseldorf, Germany. (Doc. No. 21, at 7.) This shipment consisted of the

original order and the subsequent order for the Timmendorfer. (Doc. No. 21, at 7.) On March 14, Maritim received and accepted the shipment at its Dusseldorf location. (Doc. No. 21, at 7.) One month later, plaintiff requested payment for the products and sent Zimmer bank wire details and instructions about how to transmit payment for the March 3 shipment. (Doc. No. 21, at 7.)

On April 28, 2008, Zimmer called to inform plaintiff that a $48,000 payment was sent via wire. (Doc. No. 21, at 7.) Plaintiff sent an e-mail the same day explaining that payment had not been received, and Zimmer said she would look into the problem the next day. (Doc. No. 21, at 8.) Zimmer sent an e-mail on April 29 requesting a "simple breakdown of charges," which plaintiff promptly provided. (Doc. No. 21, at 8.) Zimmer also expressed interest in a "new line in-room [sic] amenity products for the 38 Maritim hotels with Maritim logo." (Doc. No. 21, at 7.)

Some time in early May 2008, Maritim began to run into problems selling plaintiff's beauty products. (Doc. No. 21, at 8.) Zimmer e-mailed plaintiff on May 15 "stating that the sell through numbers for the products at the 38 Maritim hotel locations were not really good in April, and she will talk to the CEO before taking steps to increase sales." (Doc. No. 21, at 8.) Plaintiff contacted Zimmer on May 16, asking for a copy of the "sell through numbers" for the hotels and "requesting bank details again ASAP." (Doc. No. 21, at 8.) Plaintiff again sent Zimmer bank wire details and a week later asked whether Zimmer had looked into the wire transfer problem. (Doc. No. 21, at 8.) On

June 4, 2008, plaintiff received a call from Zimmer requesting credit for products that were damaged during shipping, and Zimmer forwarded plaintiff to Brigitta Konig, the UPS handler at Maritim hotels. (Doc. No. 21, at 9.) The parties discussed the problem, and plaintiff credited Maritim's account in the amount of $5,823.60. (Doc. No. 21, at 9.)

On June 5, 2008, plaintiff received, via wire transfer, an additional $25,724.85 for the March 3 shipment. (Doc. No. 21, at 9.) Plaintiff contacted Zimmer the same day to inquire why Maritim had not wired the entire outstanding amount. (Doc. No. 21, at 9.) On August 28, 2008, after another month had passed without payment, plaintiff asked Zimmer to be connected to Maritim's accounts payable department. (Doc. No. 21, at 9.) Zimmer responded by explaining that she could not provide plaintiff with an accounts payable contact because "her position and salary would be jeopardized if she was to provide such details as a direct contact." (Doc. No. 21, at 9.)

By April 6, 2009, plaintiff still had not received the balance due on the March 2008 shipment. (Doc. No. 21, at 10.) Plaintiff e-mailed Zimmer on April 6, pleading for payment and threatening to approach her superiors. (Doc. No. 21, at 10.) Zimmer explained that forwarding plaintiff to her superiors would have no effect on the situation and recommended plaintiff not approach other Maritim employees. (Doc. No. 21, at 10.) Plaintiff nevertheless contacted a Maritim employee by the name of Ulla Schulz on April 20 and May 4 regarding the outstanding balance, (Doc. No. 21, at 10), but apparently received no

response.

Moving ahead to May 14, Brigitta Koenig, another alleged employee of Maritim, e-mailed plaintiff to ask for updated pricing and minimum order requirements for another order to be shipped to the Timmendorfer Hotel. (Doc. No. 21, at 10.) Plaintiff responded with the requested information, and Ms. Koenig requested "a discount on product prices previously sent on May 4, 2009, for the Maritim Timmendorfer Hotel." (Doc. No. 21, at 10.) Plaintiff sent an additional e-mail requesting more information about which products Ms. Koenig was interested in. (Doc. No. 21, at 11.)

On June 2, 2009, Britt Winters, an employee of Maritim, called plaintiff to discuss Maritim's outstanding balance. (Doc. No. 21, at 11.) She asked plaintiff to refrain from discussing the issue with anyone but her and, on June 3, 2009, she explained in an e-mail that she had "relayed the information of outstanding payment to Maritim CEO [to] inquire about the payment." (Doc. No. 21, at 11.) One week later, plaintiff received another e-mail from Winters, this time "stating that Maritim cannot have communication with Plaintiff regarding non-payment as they have been enjoined by the attorney for Zimmer with a letter." (Doc. No. 21, at 11.) Plaintiff requested a copy of the injunction but neither Maritim nor Zimmer has ever provided one. (Doc. No. 21, at 11.) As of the filing of the amended complaint, plaintiff states that no further payment from Maritim has been forthcoming. (Doc. No. 21, at 11.)

Plaintiff claims that defendant Zimmer was, at all relevant times, acting

as an agent of Maritim. In support of this conclusion, plaintiff alleges the following facts:

    a.    Zimmer supplied Plaintiff with complementary hotel rooms at Maritim;

    b.    Zimmer hosted Maritim events at Maritim hotels;

    c.    Zimmer provided Plaintiff complimentary food and beverages during all of Plaintiff's stays at Maritim hotels;

    d.    Zimmer sent Plaintiff complimentary Maritim chauffeurs from airports;

    e.    Zimmer offered additional complimentary stays at Maritim hotels;

    f.    Zimmer represented to Plaintiff that Zimmer received salary from Maritim;

    g.    Plaintiff observed Zimmer in meetings with Maritim directors;

    h.    Zimmer described to Plaintiff confidential corporate initiatives of Maritim, such as the hotels putting coffee bars in their chain of hotels, and changing from leased spa space to corporate owned/operated space; and

    I.    Agents of Maritim, other than Zimmer, directly contacted Plaintiff in regard to both the subject contract, as well as other proposed contracts, as set forth above.

    j.    Those agents of Maritim, communicated directly to Plaintiff, under letterhead and return e-mail address of Maritim, as set forth above;

    k.    One of those agents of Maritim, that communicated under Maritim letterhead, and Maritim return e-mail address, and in regard to the specifics of the subject contract, is believed to be the mother of Zimmer, as set forth above;

    l.    It is further believed, and therefore averred that Zimmer, and other members of her family have maintained close personal relationships with the directors of Maritim, for much or all of Zimmer's life.

This motion comes before the court in response to an amended complaint. (Doc. No. 21.) On August 27, 2012, Judge Caputo dismissed plaintiff's original complaint without prejudice for failure to properly plead personal jurisdiction over defendants Zimmer and Maritim. (Doc. No. 20, at

8

7-8.) More specifically, plaintiff "provided so little detail about its relationship and the alleged contract formation with Maritim that it [could not] be concluded from this evidence that specific personal jurisdiction exists as to Maritim in this forum." (Doc. No. 20, at 8.) As to Zimmer, "plaintiff . . . simply failed to provide any evidence documenting the frequency, nature, context, or substance of [the] communications." (Doc. No. 20, at 8.) In light of these considerations, the court will now examine the amended complaint to see if plaintiff has properly pleaded jurisdiction, venue, and its substantive claims.

## RULE 12(b)(2) & (3) MOTIONS: VENUE AND JURISDICTION

**A.) STANDARD OF REVIEW**

Rule 12(b)(2) provides for the dismissal of a complaint if the plaintiff fails to establish that the court has personal jurisdiction over the parties. Fed.R. Civ.P.12(b)(2). Rule 12(b)(3), in conjunction with 28 U.S.C. §1391, requires the court to dismiss the case if the plaintiff fails to show that the district in which the suit is brought is the proper venue. Fed.R.Civ.P. 12(b)(3).

Rule 12(b)(2) requires the court to accept the truth of factual allegations in the complaint relating to jurisdiction and the reasonable inferences that flow therefrom unless the moving party produces evidence tending to contradict the existence of jurisdiction. In re Chocolate Confectionary Antitrust Litigation, 674 F.Supp.2d 580, 595 (M.D.Pa. 2009). In other words, a party may rely entirely on allegations unless and until the moving party presents the court

with actual evidence to the contrary. Id.; Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004) ("when the court does not hold an evidentiary hearing on the motion to dismiss, . . . the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor."); but see, e.g., Rodi v. S. New Eng. Sch. of Law, 255 F.Supp.2d 346, 348 (D.N.J. 2003) ("the plaintiff may not rely on the pleadings, but rather must introduce sworn affidavits or other competent evidence.").

If the moving party does submit competent evidence refuting jurisdiction, the non-moving party shoulders the burden of establishing, by a preponderance of the evidence, that the court has jurisdiction over the matter. In re Chocolate Confectionary Antitrust Litigation, 674 F.Supp.2d at 595 ("Once these allegations are contradicted by an opposing affidavit, however, plaintiffs must present similar evidence in support of personal jurisdiction."). At this point, the plaintiff may not rely on bare pleadings but must support those pleadings with "actual proofs, not mere allegations." Id. (quoting Patterson by Patterson v. FBI, 893 F.2d 595, 603-04 (3d Cir. 1990)). As such, "although the burden of persuasion always lies with the non-moving party, the burden of production rests initially with the party moving for dismissal under Rule 12(b)(2)." Id. at 595, n. 21.

## B. THE BURDEN OF PROOF ISSUE

Before turning to the facts of this case, the court must first determine whether plaintiff in this case may establish personal jurisdiction by relying

solely on allegations or whether plaintiff must establish evidentiary proof. This question occupies a position of central importance in this case. On August 27, 2012, Judge Caputo determined that plaintiff's initial complaint and affidavit in support of jurisdiction failed to establish personal jurisdiction and dismissed the complaint without prejudice pursuant to Rule 12(b)(2). (Doc. No. 19.) Plaintiff filed an amended complaint of considerable length and detail but has not included evidentiary material in excess of what Judge Caputo considered in dismissing the complaint, only additional allegations. If plaintiff must, under applicable law, produce competent evidence to show jurisdiction, the amended complaint fails because Judge Caputo already determined that plaintiff's affidavit did not provide enough detail about defendants' contacts with the Middle District. If allegations are sufficient, the court must consider jurisdiction anew in light of the fact that the amended complaint contains new allegations. After a review of the 12(b)(2) motions and accompanying briefs of defendants Maritim and Zimmer, the court has determined that neither defendant has presented the court with affidavits or other evidence challenging jurisdiction. As such, the court must consider plaintiff's allegations to determine whether they suffice to establish personal jurisdiction.

## C. AGENCY RELATIONSHIP

Before proceeding to the question of personal jurisdiction, it is necessary to determine whether defendant Zimmer was acting as Maritim's agent during the time period in question, or at least whether the allegations raise this as a

plausible inference. See [Rantnetwork, Inc. v. Underwood, 11-CV-1283, 2012 WL 1021326, \*5 (M.D.Pa. 2012)](analyzing agency question first when jurisdiction is premised on agent's contacts with forum). If so, her contacts with the forum state factor into whether Maritim is subject to this court's jurisdiction.

Pennsylvania recognizes four kinds of agency, but all "have three basic features in common: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." [Rantnetwork, Inc. v. Underwood, 11-CV-1283, 2012 WL 1021326, \*5 (M.D.Pa. 2012)](). While express authority "is directly granted by the principal to the agent . . . apparent authority arises from representations that the principal makes to those third parties with whom the agent acts on the principal's behalf." Id. However, "[w]hether the alleged authority is actual, apparent or otherwise, the element of control is the touchstone of a principle-agent relationship." [Rantnetwork, Inc. v. Underwood, 11-CV-1283, 2012 WL 1021326, \*5 (M.D.Pa. 2012)](). In the context of a motion to dismiss, "[d]irect proof is unnecessary when the proffered evidence allows an inference of at least an implied intention to create the relationship of principal and agent." Id. Nevertheless, "the mere showing that one person does an act for another does not give rise to an inference that an agency relationship existed." Id.

Under the federal rules, a plaintiff must plead "enough facts from which

12

a plausible claim of an agency relationship can be inferred . . . not simply assert in conclusory terms that a party is another party's agent for purposes of vicarious liability." Johnson v. Dunkin' Donuts Franchising L.L.C., 2012 WL 1828028, 11-CV-1117 (W.D.Pa. 2012) (interpreting Fed.R.Civ.P. 8). When the agency question is raised in the context of a Rule 12(b)(2) motion, however, the plaintiff's burden is the same as the burden of establishing jurisdiction. Rantnetwork, 2012 WL 1021326, at *5. Therefore, a plaintiff may rely on pleadings alone so long as the defendant has not disputed agency with competent evidence.[1] Id. Because defendant has not provided evidence in this case as to the agency issue, plaintiff may rely solely on factual allegations.

The allegations in plaintiff's complaint create a compelling inference that

---

[1]The court explained:

> The existence of an agency relationships is a question of fact. The party claiming that an agency relationship exists has the burden of so showing. This burden ultimately requires the party asserting agency to prove it by a fair preponderance of the evidence, but given that, in this case, the issue of agency before the court is cast as part of the jurisdictional question, Rantnetwork is held to the same burden of production here as in the context of jurisdiction itself: to the extent that the Underwoods contest agency in Mr. Underwood's affidavit, Rantnetwork must make a prima facie showing of an agency relationship between the Underwoods through the introduction of its own affidavits or other competent evidence. Rantnetwork, Inc. v. Underwood, 11-CV-1283, 2012 WL 1021326, *5 (M.D.Pa. 2012).

there was a principal-agent relationship between defendants Zimmer and Maritim. Plaintiff alleges, and the court must accept as true, the following facts:

a. Zimmer supplied Plaintiff with complementary hotel rooms at Maritim;

b. Zimmer hosted Maritim events at Maritim hotels;

c. Zimmer provided Plaintiff complimentary food and beverages during all of Plaintiff's stays at Maritim hotels;

d. Zimmer sent Plaintiff complimentary Maritim chauffeurs from airports;

e. Zimmer offered additional complimentary stays at Maritim hotels;

f. Zimmer represented to Plaintiff that Zimmer received salary from Maritim;

g. Plaintiff observed Zimmer in meetings with Maritim directors;

h. Zimmer described to Plaintiff confidential corporate initiatives of Maritim, such as the hotels putting coffee bars in their chain of hotels, and changing from leased spa space to corporate owned/operated space; and

I. Agents of Maritim, other than Zimmer directly contacted Plaintiff in regard to both the subject contract, as well as other proposed contracts, as set forth above;

j. Those agents of Maritim, communicated directly to Plaintiff, under letterhead and return e-mail address of Maritim, as set forth above;

k. One of those agents of Maritim, that communicated under Maritim letterhead, and Maritim return e-mail address, and in regard to the specifics of the subject contract, is believed to be the mother of Zimmer, as set forth above;

l. It is further believed, and therefore averred that Zimmer, and other members of her family, have maintained close personal relationships with the directors of Maritim, for much or all of Zimmer's life. (Doc. No. 21, at 13-14.)

One of the most striking components of these allegations is that Zimmer provided plaintiff with information only a corporate insider would know and furnished him with complimentary services only someone intimately

associated with the company could procure. Plaintiff states, "Zimmer described to Plaintiff confidential corporate initiatives of Maritim, such as the hotels putting coffee bars in their chain of hotels, and changing from leased spa space to corporate owned/operated space." (Doc. No. 21, at 13.) Plaintiff also claims that Zimmer provided him, free of charge, rooms, food, beverages, and chauffeur service between the airport and Maritim hotels. (Doc. No. 21, at 13.)

Another striking feature of these allegations is the fact that other people purporting to be Maritim employees contacted plaintiff after Zimmer initially ordered products from It's Intoxicating. (Doc. No. 21, at 13.) These employees called in regard to and discussed the orders placed by Zimmer and never questioned that they were properly made by Zimmer on behalf of Maritim. (Doc. No. 21, at 13.) Furthermore, plaintiff claims to have seen Zimmer in business meetings with Maritim directors and claims Zimmer told plaintiff that she received a salary from Maritim. (Doc. No. 21, at 13.) These facts, taken as true and viewed in the light most favorable to the non-moving party, create a plausible inference that Zimmer was acting as Maritim's agent when she ordered beauty products from plaintiff.

## D. PERSONAL JURISDICTION

Having decided the burden of proof and agency questions, the court must now decide whether it can exercise jurisdiction over defendants

Zimmer and Maritim. Plaintiff's complaint purports to set forth two grounds upon which this court may find jurisdiction, (Doc. No. 21), the first one being that defendants are subject to the state's long-arm jurisdiction and the second one being that they are bound by the following forum selection clause:

> This agreement will be governed by and construed in accordance with the laws of the state of Pennsylvania, United States of America. The parties hereto hereby consent to the exclusive jurisdiction and venue of the United States District Court for Luzerne County for any action that may be brought in connection with this agreement and/or from the use of the Aromapro software and/or from the use of the Aromapothecary products. (Doc. No. 21, at 3.)

Under the Federal Rules of Civil Procedure, a federal court has jurisdiction over an out-of-state defendant to the extent permitted by state law. Fed. R. Civ. P. 4(k). Pennsylvania has adopted a long-arm jurisdiction statute, so federal courts within the state may exercise jurisdiction "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. §5322(b). In interpreting the Due Process Clause, federal courts have restricted personal jurisdiction to those cases where the defendant has at least "minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Arlington Industries, Inc. v. Electronic Custom Distributors, Inc., 817

F.Supp.2d 473, 477 (M.D.Pa. 2011). More specifically, the defendant "must have purposefully availed itself of the privilege of conducting activities within the forum," or "purposefully directed its activities at the forum." O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 317 (3d Cir. 2007) ("purposefully availed"); Sieg v. Sears Roebuck & Co., 855 F.Supp.2d 320, 324 (M.D.Pa. 2012) ("purposefully directed"). Furthermore, the cause of action alleged in the complaint must "arise out of or relate to" the defendant's contacts with the forum. O'Connor, 496 F.3d at 317. If these requirements have been met, jurisdiction is "presumptively constitutional, and the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Rantnetwork, Inc. v. Underwood, 11-CV-1283, 2012 WL 1021326, *9 (M.D.Pa. 2012). For instance, "a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice." D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 102 (3d Cir. 2009); Mellon Bank (East) PSFS, Nt. Ass'n v. Farino, 960 F.2d 1217 (3d Cir. 1992) (explaining that "fair play and substantial justice" inquiry is not mandatory).

When deciding jurisdiction over a contractual dispute, the "court must consider the totality of the circumstances." Telcordia Tech., Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006). Although "specific jurisdiction frequently depends on physical contacts with the forum," the defendant's

actual presence is not necessary and has become increasingly "less determinative" with the advent of "communication by electronic facilities." Gen. Elec. Co. v. Deutz Ag, 270 F.3d 144, 150-51 (3d Cir. 2001). The Third Circuit has enumerated several factors that courts should consider in determining whether the course of dealing between two parties to a contract satisfies the strictures of the minimum contacts test. ADM Milling Co. v. Gold Crust Baking Co., Inc., 09-CV-544, 2009 WL 1885880, at *2 (M.D.Pa. 2009). These include:

> 1) the location of the contract negotiations, 2) whether the non-resident solicited business from the forum state, 3) whether the non-resident invoked and received benefits under the laws of the forum state, 4) the contemplated future consequences of the contract, 5) the terms and provisions of the contract, 6) the parties' course of dealing, and 7) the type of goods sold. Id.

Two Third Circuit cases, *Farino* and *Vetrotex*, demonstrate why jurisdiction is proper in this case. See Mellon Bank PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1219-21 (3d Cir. 1992); Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co., 75 F.3d 147 (1996). In comparing Third Circuit precedent to the facts in this case, the court is mindful that "questions of personal jurisdiction do not lend themselves to categorical determinations." Mellon Bank (East) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1224-25 (3d Cir. 1992). Each case should be determined on its own, unique facts, so "citing cases where other courts found other defendants in similar circumstances to be subject to that court's jurisdiction may or may

18

not be helpful." Id. at 1224. Nonetheless, legal precedent provides invaluable context and ensures consistency in the Circuit's approach to personal jurisdiction. See id. ("Nevertheless, this proposition does not mean that we must decide such cases in a vacuum, without the benefit of the wisdom and insight of other courts that have decided similar questions.") Therefore, the court will compare *Farino* and *Vetrotex* while mindfully examining the unique facts of this case.

In *Farino*, the court was asked to determine whether the District Court for the Eastern District of Pennsylvania had jurisdiction over several Virginia partnerships that entered into a loan contract with a Pennsylvania bank. Mellon Bank PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1219-21 (3d Cir. 1992).When the bank sued for recovery of the delinquent loan, the Third Circuit noted that the existence of a contract is not sufficient, by itself, to create minimum contacts and establish personal jurisdiction. Id. at 1223. Nonetheless, the court pointed to several features of the parties' relationship that did constitute minimum contacts and affirmed the lower court's finding of jurisdiction. Id. at 1223-24, 1227. First of all, the defendants, limited partners in several Virginia partnerships, solicited business from Mellon, which was a Pennsylvania corporation. Id. at 1223. The Third Circuit noted, "[i]t was defendants who approached Mellon and through this contact established a business relationship with a Pennsylvania entity." Id. Second,

the circuit court found that the defendants were clearly aware that they were dealing with a Pennsylvania corporation, stating:

> They were all well aware, or should have been, that they were dealing with a Pennsylvania bank. The guaranty and suretyship agreements, which they all signed, and the notes that those guaranties backed indicated that Mellon was a Pennsylvania entity. Payments on the notes and on the guaranties, if necessary, and any other correspondence were to be sent to Mellon's Philadelphia address. Id.

Finally, the court determined that the parties, by entering into a loan contract providing for repayment over the course of several years, knowingly established a long-term relationship with continuing obligations that would last for at least several years. Id. In particular, the parties negotiated three loans over the course of a year, all of which contemplated interest payments spanning three years into the future. Id. The court seized on these facts, indicating, "[i]n making personal jurisdiction decisions, we must employ a highly realistic approach and are to take into account prior negotiations and *contemplated future consequences*, along with the terms of the contract and the parties' *actual course of dealing*." Id. at 1224. Therefore, the length of the loan agreement, the expectation that the relationship would continue for years, and the defendants' initiation of the relationship even after being informed that they were dealing with an Pennsylvania corporation convinced the court that there were sufficient minimum contacts to support jurisdiction.

The next case, *Vetrotex*, provides context to *Farino* by demonstrating

when a defendant's contacts with the forum do not suffice to establish jurisdiction. [Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co., 75 F.3d 147 (1996)](). In that case, Vetrotex, a Pennsylvania corporation entered into "sporadic contracts" to sell fiber glass products to Conglas, a California corporation, between 1980 and 1989. Id. at 148-49. At the time of the dispute, Conglas "had no offices, employees, or representatives in Pennsylvania, nor ha[d] it ever sold any of its products in Pennsylvania, or engaged in sales to distributors or other third parties who sold Conglas products in Pennsylvania." Id. at 148. In 1989, the companies parted ways, only to resume their relationship in 1991 pursuant to a new agreement. Id. at 149. Two years later, Vetrotex decided to exit the fiber glass market and, in response, Conglas withheld payment for goods previously shipped. Id. Conglas filed suit in the Eastern District of Pennsylvania and, on appeal, the Third Circuit expressly distinguished the case at hand from its earlier ruling in *Farino*. Id. at148,152-53. The court noted that the out-of-state defendant did not initiate the relationship or solicit business from a Pennsylvania corporation, the defendant did not sent payments to the forum state, and the parties did not "engage[] in extensive post-sale contacts" in the forum state. Id. According to the court, such a "passive buyer of Vetrotex's product" did not purposefully avail itself of the privilege of doing business in Pennsylvania. Id.

Here, defendant Zimmer and Maritim cannot be considered "passive buyers" of plaintiff's products. Unlike in *Vetrotex*, Zimmer, allegedly acting as an agent of Maritim, initiated contact with plaintiff, a Pennsylvania corporation, on October 5, 2007. (Doc. No. 21, at 1.) Within two weeks of their first conversation, Zimmer expressed interest in plaintiff's products, asked how long it would take to fill an order, provided plaintiff with Maritim's budget, requested further information about the products, and asked that the products be sold exclusively to Maritim. (Doc. No. 21, at 2-3.) Moreover, it was Zimmer, allegedly acting on Maritim's behalf, that proposed that the parties sign an exclusivity agreement and asked two times that the agreement be amended. (Doc. No. 21, at 3,5.) On October 22, Zimmer requested a list of "suggested retail prices Maritim should charge for the specific products for the Maritim Timmendorfer Strand Hotel," and on October 23, only one day later, Zimmer asked for a comprehensive list of plaintiff's current clients. (Doc. No. 21, at 4.) In November 2007, Zimmer shared "confidential sales numbers" with plaintiff concerning one of Maritim's hotels. (Doc. No. 21, at 5.) In January 2008, Zimmer allegedly placed an order for 441 cartons of products comprising four shipping skids. (Doc. No. 21, at 6-7.)

Several months later, Zimmer contacted plaintiff to inquire about a "new line of in-room amenity products" for Maritim's hotels, (Doc. No. 21, at 7),

and in May 2009, nearly two years after initial contact with plaintiff Maritim, another representative contacted plaintiff about purchasing more products. (Doc. No. 10.) These facts show an active buyer who initiated contact with plaintiff, solicited business from a Pennsylvania corporation, and bargained over the terms of an ongoing relationship between the parties. The fact that Zimmer requested an 18 month exclusivity agreement indicates that, not only did the parties embark on long-term relationship, but that defendants intended to create a long-term relationship with a Pennsylvania corporation. That relationship lasted from October 5, 2007 when Zimmer first contacted plaintiff until May 14, 2009 when Brigitta Koenig submitted a final order request via e-mail. (Doc. No. 21.)

Furthermore, taking the facts in the complaint as true, defendants cannot argue that they were unaware that plaintiff was a Pennsylvania corporation. Plaintiff alleges that it sent Zimmer a copy of its "Conditions of Sale," which stated that the parties would be subject "to the exclusive jurisdiction and venue of the United States District Court for Luzerne County." (Doc. No. 21, at 3.) In addition, Zimmer, acting on behalf of Maritim, placed phone calls and mailed physical documents to plaintiff's Pennsylvania facilities. (Doc. No. 21, at 1-5, 6, 7.) Therefore, defendants should have been on notice that they were dealing with a corporation in the forum state.

23

The complaint nowhere alleges that defendants Zimmer or other agents of Maritim were ever physically in the Middle District of Pennsylvania, but while physical presence is undoubtedly relevant to the question of jurisdiction, it is also far from necessary. It's Intoxicating, Inc. v. Maritim Hotegesellschft, mbH, 11-CV-2379, 2012 WL 3686784, \*4 (M.D.Pa. 2012) ("Specific jurisdiction frequently depends on physical contacts with the forum."). In a digital age, geographic location "becomes less determinative" as "communication by electronic facilities, rather than physical presence, is the rule." Shadowbox Pictures, LLC v. Global Enterprises, Inc., 05-CV-2284, 2006 WL 120030, \*4 (E.D.Pa. 2006). Therefore, the fact that defendants did not set foot in Pennsylvania is not determinative of the issue. In light of the frequent and ongoing contacts between the parties, many of which were initiated by defendants, the court has determined that defendants Zimmer and by extension Maritim established minimum contacts with the forum state.

This case also arises out of defendants' contacts with the forum state, the second requirement for specific personal jurisdiction. Plaintiff is suing for breach of contract and all the contacts upon which jurisdiction is based were in furtherance of that contractual relationship. General Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001) ("In contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental

in either the formation of the contract or its breach."). The court is then left to consider whether jurisdiction in this case "comports with fair play and substantial justice." Once the court has found minimum contacts, however, jurisdiction is "presumptively constitutional, and the defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." GeoDecisions v. Data Transfer Solutions, LLC, 10-CV-2180, 2010 WL 4718785, *5 (M.D.Pa. 2010).

In support of its case, Maritim argues, "[m]oreover, exercising jurisdiction over Maritim would not comport with traditional notions of fair play and substantial justice as Maritim has had no contact whatsoever to this forum, and at best, [p]laintiff has only alleged an agreement to sell its products in Germany." This argument, while nominally addressing the third prong of the jurisdictional test, essentially reiterates defendants' minimum contacts argument. As such, defendants have not persuaded the court that jurisdiction is inappropriate. Therefore, defendants' Rule 12(b)(2) motions will be **DENIED**. Because the court has jurisdiction over defendants pursuant to Pennsylvania's long-arm statute, the court need not address plaintiff's argument that it has jurisdiction under the contractual forum-selection clause.

## E. VENUE

Defendants next challenge plaintiff's choice of venue. (Doc. No. 23, at

8-9; Doc. No. 32, at 11-13.) Under Third Circuit law, defendants "have the burden of demonstrating that venue is improper." Kravitz v. Niezgoda, 12-CV-487, 2012 WL 4321985, \*4 (E.D.Pa. 2012); Merchants Mut. Ins. Co. v. Benchoff, 09-CV-418, 2009 WL 2207813, \*2 (W.D.Pa. 2009) (Myers v. American Dental Ass'n, 695 F.2d 716, 724-125 (3d Cir. 1982)). Under federal law, venue is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's jurisdiction with respect to such action. 28 U.S.C. §1391.

The venue issue becomes particularly complicated where, as here, the parties' entire relationship consisted of electronic communications or written correspondences. Part two of the venue statute provides that a court has venue if a "substantial part of the events or omissions giving rise to the claim occurred" in that court's district. 28 U.S.C. §1391. When an entire business relationship is conducted via telephone or e-mail, as here, it cannot be said that a substantial part of the events occurred in one location or the other; rather, it is more appropriate to say that a substantial part of the events occurred in both locations simultaneously. This interpretation of §1391 does not run afoul of the statute because venue over a single dispute may exist

in more than one forum. Emekekwue v. Agwuegbo, 12-CV-1503, 2012 WL 5386279, \*6 (M.D.Pa. 2012) ("Although venue may be proper in more than one jurisdiction, the statute makes clear that the events or omissions supporting a claim in a given jurisdiction must be substantial."). Of course, here the other location where a substantial part of the events occurred was in Germany, and the venue statute clearly does not apply to the German courts. Nonetheless, the court believes that a substantial part of the events occurred in the Middle District of Pennsylvania such that this district is one, if not the only, appropriate venue in which to bring this case. The complaint alleges that all calls, e-mails, and negotiations between the parties were conducted from a location within the Middle District of Pennsylvania. (Doc. No. 21.) Plaintiff also received partial payment and shipped its products from the Middle District. Bowdoin v. Oriel, 98-CV-5539, 1999 WL 391486, \*5 (E.D.Pa. May 5, 1999) (finding that phone calls from and checks received by the plaintiff within the geographic boundaries of the district were sufficient to make venue appropriate in the district); Nowicki v. United Timber Co., 99-CV-257, 1999 WL 619648, \*1 n. 1 (E.D.Pa. Aug. 12, 1999) (negotiation and execution of contract via telephone made venue proper in the Eastern District of Pennsylvania); Control Screening LLC v. Integrated Trade Systems, Inc., 10-CV-499, 2011 WL 3417147, \*5 (D.N.J. Aug. 3, 2011) (finding that negotiations via e-mail established venue); Construction

Specialties, Inc. v. Ed Flume Building Specialties, Ltd., 05-CV-1863, 2006 WL 42181, *3 (M.D.Pa. Jan. 6, 2006) (finding venue where products were manufactured and shipped and payment was due in the district). These facts convince the court that a substantial part of the events occurred here.

Even if the court did not find venue under §1391(b)(2), it would exist under §1391(b)(3), which provides that venue is appropriate in a court that has personal jurisdiction over the parties "if there is no district in which any action may otherwise be brought." 28 U.S.C. §1391(b)(3). Assuming that venue is not proper under §1391(b)(2), plaintiff must look to §1391(b)(1) and §1391(b)(3). Venue cannot be established under §1391(b)(1) because defendants do not reside in any judicial district in the United States, let alone the same state. 28 U.S.C. §1391(b)(1) ("A civil action may be brought . . . in any district in which any defendant resides, if all defendants are residents of the State in which the district is located."). Under §1391(b)(3), venue would be appropriate here because the court has already determined that this court has personal jurisdiction over defendants Zimmer and Maritim. 28 U.S.C. §1391(b)(3) (providing that venue is appropriate in a court that has personal jurisdiction over defendants if venue cannot be established in any other district). As such, venue is appropriate in the Middle District of Pennsylvania, and defendants motion to dismiss for lack of subject matter pursuant to Rule 12(b)(3) is **DENIED**.

Because venue is appropriate pursuant to 28 U.S.C. §1391, the court will not consider plaintiff's argument that venue is proper under the venue selection clause allegedly agreed upon by the parties. (Doc. No. 21, Att. 1.)

## RULE 12(b)(6) MOTION TO DISMISS

### A.) STANDARD OF REVIEW

Defendant's motion to dismiss is brought pursuant to the provisions of Fed. R. Civ. P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, (Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005)), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 127 S. Ct. at 1965. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. Id. Furthermore, in order to satisfy federal pleading requirements, the plaintiff

29

must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).

## B.) FRAUD

Plaintiff's first claim is that defendants "conspired to fraudulently induce the contract and obtain the goods from Plaintiff, without intention to pay full

price, and with subsequent effort to avoid payment through deceit." (Doc. No. 21, at 15.) Defendants move to dismiss this claim on statute of limitations grounds, pointing out that it has been more than two years since the alleged fraud occurred. (Doc. No. 23, at 13; Doc. No. 32, at 21.) They also move to dismiss on the ground that plaintiff failed to allege the elements of fraud with sufficient particularity. (Doc. No. 23, at 11.) The court agrees with defendants that the fraud counts should be dismissed on both grounds. Therefore, the motion to dismiss plaintiff's fraud claim against defendants Maritim and Zimmer will be **GRANTED**.

*1.) The Statute of Limitations*

This court has diversity jurisdiction over this claim pursuant to 28 U.S.C. §1332. Under the Erie Doctrine, a federal court sitting in diversity must apply the substantive law of the state in which it sits, including the statute of limitations. Schach v. Ford Motor Co., 01-CV-798, 210 F.R.D. 522, 523 (M.D.Pa. 2002). As such, Pennsylvania law would apply, and a party alleging fraud would be allotted a two year limitations period within which to file suit after the fraud claim accrues, i.e. "[the date that] the plaintiff could have first maintained the action to a successful conclusion." 42 Pa.C.S.A. §5524(7); Dongelewicz v. PNC Bank Nat'l. Ass'n. 104 Fed. Appx. 811, 818 (3d Cir. 2004); Lincoln General Ins. Co. v. Kingsway America Agency, Inc., 11-CV-1127, 2013 WL 458449, *3 (M.D.Pa. 2013); Fine v. Checcio, 870

[A.2d 850, 857 (3d Cir. 2005)](#) ("Thus, we have stated that the statute of limitations begins to run as soon as the right to institute and maintain a suit arises."). To establish when the fraud claim accrued, the court must first look at the elements of fraud under Pennsylvania law. These include:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. [Bouriez v. Carnegie Mellon University, 585 F.3d 765, 771 (3d Cir. 2009)](#) (quoting [Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994)](#)).

Under Pennsylvania law, the statute of limitations for a fraud claim begins to run when the injury is suffered. [Sunguard Recovery Services L.P. v. Unisource Worldwide, Inc., 02-CV-3845, 2002 WL 32107630, \*2 (E.D.Pa. 2002)](#). Plaintiff is seeking damages for nonpayment of the price of goods delivered to Maritim, so plaintiff's injury would be the $181,547.80 which it never received as payment. (Doc. No. [21](#), at 7.) While the nature of the injury is relatively straightforward, the date of plaintiff's injury is much less clear in this case. The complaint itself does not indicate that the parties agreed payment would be made on any particular date. However, based on the allegations in the complaint, the court can infer that the parties agreed to payment before December of 2009.

Plaintiff alleges that it asked Maritim on at least nine occasions to remit payment for the shipment of beauty products. (Doc. No. [21](#), paragraphs 63,

71, 81, 86, 90, 93, 98, 100, 103.) Notably, the last date that plaintiff alleges it requested payment was December 2009, and the chronologically last date mentioned in the entirety of the complaint was December 16, 2009. These allegations strongly indicate that the alleged contract between plaintiff and defendant contemplated payment before, at the very latest, December 16, 2009, because otherwise plaintiff would not have been "pleading for payment." (Doc. No. 21, at 10.) Meanwhile, plaintiff commenced this lawsuit on December 26, 2011, two years and ten days after the latest date in plaintiffs complaint and, as far as the court can tell, more than two years after plaintiff suffered an injury as a result of defendants' nonpayment. Moreover, plaintiff fails to present the court with any argument that the statute should be tolled. In fact, plaintiff fails to address the issue at all in its briefing on the subject. Therefore, plaintiff's fraud claim is barred by the statute of limitations.

*2.) Failure to Meet Pleading Standards*

Even assuming that the statute of limitations does not dispose of plaintiff's fraud claim, plaintiff has failed to adequately allege fraud under the pleading requirements of the Federal Rules. Fed.R.Civ.P. 9. Rule 9 requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). The Third Circuit has explained that this Rule requires a party alleging fraud to "state the circumstances of the alleged

fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007). This requires the plaintiff to allege "the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." Id.

Plaintiff's complaint wholly fails to state the particular facts of defendants' alleged fraud. (Doc. No. 21, at 1-7.) It makes no mention of any fraudulent statement, instead stating "[t]he facts above support the conclusion that Defendants conspired to fraudulently induce the contract and obtain the goods from Plaintiff, without intention to pay full price, and with subsequent effort to avoid payment through deceit." (Doc. No. 21, at 15.) The "above facts," however, do not point to any statement or any time, date, or location of that statement. Indeed, the requirements of fraud pleading are strict, but the rules are clear. *Frederico*, 507 F.3d at 200 (observing difficulty of identifying speaker of fraudulent statement without discovery).[2]

---

[2]The court said:
We are mindful of Frederico's observation that without the benefit of discovery she could not learn the name of the employee with whom she interacted when attempting to return the truck. Nevertheless, her complaint only refers generally to being informed by Defendants and does not disclose the circumstances surrounding her discussion with, or any information about, the particular individual who informed her that the rental department was closed. Frederico v. Home Depot, 507 F.3d 188, 201 (3d Cir.

Plaintiff's brief in opposition explains, "[p]laintiff brings a fraud claim against both as the facts, especially the close relationship of [d]efendants, lack of any excuse for non-payment, and deceitful attempt to avoid [p]laintiff, suggest that [d]efendants induced delivery of the goods with no intention to pay." (Doc. No. 31, at 3; Doc. No. 33, at 3.) In essence, plaintiff is relying on the suspicious circumstances of defendants' nonpayment to suggest that defendants had a sinister plan to procure products from plaintiff without paying for them. As stated above, the federal rules, which require specificity when pleading fraud, do not allow the court to infer fraud from these general facts. Because plaintiff fails to identify a particular false statement and a time, date, or location of the statement, it has failed to state a fraud claim for which relief can be granted. Therefore, the court will **GRANT** defendants' Rule 12(b)(6) motions insofar as they seeks dismissal of plaintiff's fraud claim.

## C.) BREACH OF CONTRACT

Plaintiff also raises a breach of contract claim against Maritim and, in the alternative, Zimmer, arguing that the parties did not pay for the goods plaintiff shipped to Maritim on March 3. (Doc. No. 21, at 14-15.) Both Maritim and Zimmer subsequently filed separate motions to dismiss the breach of contract claim contending that the parties had never created a binding

2007).

contract. As a preliminary matter, because defendant Maritim is a foreign corporation and defendant Zimmer is a resident of a foreign country, the court must consider whether the United Nations Convention on Contracts for the International Sale of Goods applies to the contract in this case, thereby preempting Pennsylvania law.

The CISG is a "self-executing treaty with the preemptive force of federal law," which "applies to contracts for the sale of goods between parties whose places of business are in different States . . . when the States are contracting States." 15 U.S.C.App., Art. 1(1)(a); American Mint LLC v. GOSoftware, 05-CV-650, 2005 WL 2021248, \*2 (M.D.Pa. 2005). "If a party has more than one place of business, then that party's place of business is that which has the closest relationship to the contract and its performance, having regard to the circumstances known to or contemplated by the parties at any time before or at the conclusion of the contract." American Mint LLC v. Gosoftware, Inc., 05-CV-650, 2006 WL 42090, \*4 (M.D.Pa. 2006) (quoting 15 U.S.C.App. Art. 10). "However, the fact that the parties have their places of business in different States is to be disregarded whenever this fact does not appear either from the contract or from any dealings between, or from information disclosed by, the parties at any time before or at the conclusion of the contract." Id. (quoting 15 U.S.C.App. Art. 1(1)(2)).

While the CISG's application is broad, "[it] applies only to buyers and

sellers, not to third parties." Id. (citing 15 U.S.C.App. Art. 4). Furthermore, the parties to a contract may agree to apply a signatory's domestic law, but only by affirmatively opting-out of the CISG. 15 U.S.C.App. Art. 6; American Mint LLC v. GOSoftware, Inc., 05 WL 650, 2005 WL 2021248, *2 (M.D.Pa. 2005). Therefore, a choice of law provision, to be effective, must not only select the law that will apply but affirmatively state that the CISG will not apply to the contract. Id. at *3 ("The alleged contract in this case contains a provision selecting Georgia law as the law governing disputes under the contract; however, the contract fails to expressly exclude the CISG by language which affirmatively states it does not apply.")

Here, defendants' place of business is Germany and plaintiff's is the United States, both countries that are signatories of the CISG. American Mint LLC v. Gosoftware, Inc., 05-CV-650, 2005 WL 2021248, *4 (M.D.Pa. 2006). Furthermore, because of the parties extensive communications prior to defendant's first product order and because the alleged contract contained a shipping agreement, (Doc. No. 21, at 7), it appears that the parties were aware that they were dealing with foreign entities either before or at the time a contract was formed as required by Article I. 15 U.S.C.App. Art. I. Therefore, on its face, it appears that the CISG governs this contract dispute. Nevertheless, the parties point out that the exclusivity agreement contained a choice of law clause which states in part, "this agreement will

be governed by and construed in accordance with the laws of the state of Pennsylvania." (Doc. No. 21, Att. 1.)

As noted by the Middle District of Pennsylvania in 2005, a choice of law provision is not effective unless it expressly rejects the application of the CISG. American Mint LLC v. GOSoftware, Inc., 05-CV-650, 2005 WL 2021248, *3 (M.D.Pa. 2005). In that case, Judge Kane clarified:

> The alleged contract in this case contains a provision selecting Georgia law as the law governing disputes under the contract; however, the contract fails to expressly exclude the CISG by language which affirmatively states it does not apply. Thus, if the CISG applies to the contract at issue, it will pre-empt domestic sales laws that otherwise would govern the contract, such as Georgia law. Therefore, Defendant's assertion that the CISG does not apply due to the choice of law provision contained in the alleged contract does not control the applicability of the CISG and whether the Court has subject matter jurisdiction. Id.

Here, the parties did not affirmatively state that the CISG does not apply to this contract, so international law applies.

To plead a contract under the CISG, a party must allege an offer and an acceptance of the essential terms of a sale, including the goods, quantity, and price. 15 U.S.C.App. Art. 14(1). An offer must be "sufficiently definite and indicate[] the intention of the offeror to be bound in case of acceptance." Id. Acceptance can be made by any statement or conduct "indicating assent to an offer." 15 U.S.C.App. Art. 18(1).The CISG provides:

> However, if, by virtue of the offer or as a result of practices which the parties have established between themselves or of usage, the offeree may indicate assent by performing an act, such as one

relating to the dispatch of the goods or payment of the price, without notice to the offeror, the acceptance is effective at the moment the act is performed, provided that the act is performed within the period of time laid down in the preceding paragraph. 15 U.S.C.App. Art. 18(3).

As such, while silence or inactivity cannot constitute an acceptance under Article 18, an affirmative action that "indicat[es] assent to an offer" will suffice. 15 U.S.C.App. Art. 18. Finally, the CISG contains no statute of frauds requirement, so "a contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form." 15 U.S.C.App. Art. 11.

### 1.) *Maritim's Breach*

Defendant Maritim first seeks dismissal of plaintiff's breach of contract claim on statute of frauds grounds, arguing, "an oral contract for the sale of goods in excess of $500 cannot be enforced unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." (Doc. No. 32, at 26.) This argument is easily repudiated as the court has, after supplemental briefing on the issue, determined that the CISG applies to the contract dispute in this case. Because the CISG contains no statute of frauds requirement, defendants argument fails.

Maritim next argues that plaintiff has failed to adequately plead the essential elements of a contract action as required by the federal rules.

(Doc. No. 32, at 25-26.) Defendant states, "[b]ecause [p]laintiff has not alleged when, where, under what conditions the purported contract was made, or the particulars of any of its purported terms, [p]laintiff has left Maritim guessing and has failed to sufficiently plead the existence of a contract and its essential terms." (Doc. No. 32, at 25.)

It is true that a party must plead the essential terms of a contract, but defendant Maritim fails to cite any case law indicating that plaintiff has omitted an essential term from its pleadings. The CISG speaks very briefly to the issue, indicating that the necessary terms (for pleading purposes) are the goods, their quantity, and the price. 15 U.S.C.App. Art. 14(1). Here, plaintiff does not quote the language of the contract but claims that Zimmer made an order on behalf of Maritim, in response to which plaintiff shipped 441 cartons of beauty products on eight skids. (Doc. No. 21, at 7.) Plaintiff also sent an invoice for $181,547.80 and, when the products and invoice arrived, defendant "accepted" them and inquired two weeks later about "the production of a new line of in-room amenity products for the 38 Maritim hotels." (Doc. No. 21, at 7.) These facts are sufficient to raise a plausible inference that the parties had a contract for 441 cartons of beauty products priced at $181,547.80, especially given the copious negotiations the parties allegedly engaged in prior to Zimmer's order. (Doc. No. 21, at 1-6.) While there may be a question as to some of the terms of the agreement or the

date on which the offer and acceptance were effectuated, these are issues of fact for trial. The allegations as a whole allow the court to make the plausible inference that the parties entered into a binding contract under the CISG. Therefore, defendant Maritim's motion to dismiss plaintiff's breach of contract claim will be **DENIED**.

### 2.) *Zimmer's Breach*

Defendant Zimmer, like Maritim, attacks plaintiff's breach of contract claim on the ground that plaintiff has failed to adequately plead a breach of contract claim against her under the federal rules. (Doc. No. 23, at 14.) She explains that she was simply acting as an agent of Maritim and, therefore, the proper defendant for a breach of contract claim is Maritim. (Doc. No. 23, at 13.) Plaintiff responds, "as Maritim seemingly denies that Zimmer was its agent, such a fact would establish a direct contractual relationship between [p]laintiff and Zimmer." (Doc. No. 31, at 6.)

The first point of disagreement centers on plaintiff's use of alternative pleading to make claims against both Maritim and Zimmer for the same alleged contract. The Federal Rules allow parties to plead "as many separate claims or defenses as [they have], regardless of consistency." Fed.R.Civ.P. 8(d)(3). Nevertheless, defendant Zimmer argues that plaintiff's hypothetical pleading is inconsistent with Rule 11 of the federal rules, which requires "the factual contentions have evidentiary support or, if specifically

so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." [Fed.R.Civ.P. 11(b)(3)](#). For purposes of a motion to dismiss, however, the question is simply whether plaintiff has alleged facts sufficient to support an inference that plaintiff has a plausible claim which will be further substantiated by discovery. [Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)](#); [Ashcroft v. Iqbal, 556 U.S. 662 (2009)](#); [Top v. Ocean Petroleum, LLC, 10-CV-1042, 2010 WL 3087385, *4 (D.N.J. Aug. 3, 2010)](#) ("While something more than a mere hunch or guess is needed, the requirement is also not one necessitating evidentiary support prior to discovery.").

In the complaint, plaintiff alleges that Zimmer contacted plaintiff to order products on behalf of Maritim. (Doc. No. [21](#), at 1-2.) Furthermore, plaintiff's allegations about Zimmer's discussions and negotiations with plaintiff all indicate that Zimmer was at all times Maritim's agent. (Doc. No. [21](#), at 1-6.) For instance, plaintiff states:

9.  On or about October 11, 2007 Plaintiff received a phone call in Pennsylvania, from Zimmer asking how long it would take to manufacture and ship specific products to the Maritim hotels.
11. On or about October 14, 2007, Plaintiff sent an e-mail from Pennsylvania to Zimmer offering assistance in forecasting quantities for the 38 Maritim Hotels.
12. On or about October 15, 2007, Plaintiff received a phone call in Pennsylvania from Zimmer stating that the budget for the specific products for Maritim is $240,000.
17. On or about October 19, 2007, Zimmer called Plaintiff at her Pennsylvania phone number to communicate that Maritim

would like to buy the beauty products for their 38 hotels in Germany.

18.    On or about October 22, 2007, Zimmer called Plaintiff at her Pennsylvania phone number to request that the specific products requested be sold exclusively and only to Maritim Hotels in Germany. (Doc. No. 1, at 2-3.)

Plaintiff goes on to raise twelve specific allegations that Zimmer was acting as Maritim's agent and not in her own interest. (Doc. No. 21, at 13-14.) Plaintiff alleges that it shipped the products Zimmer ordered to a Maritim hotel called the Timmenforfer. (Doc. No. 21, at 7.) After Zimmer failed to pay plaintiff, other Maritim employees assigned to the account contacted plaintiff about the shipment, payment, and the prospect of future purchases. (Doc. No. 21.) These allegations strongly indicate that Maritim, not Zimmer, contracted with plaintiff; in fact, plaintiff mentions a contract with Zimmer only once in the complaint:

> As alternative relief, to any extent [d]efendants succeed in their apparent challenge to the agency of Zimmer for Maritim, then a contract exists between [p]laintiff and Zimmer for supply of goods to a third party, and Zimmer would be bound by the Conditions of Sale, and would owe the balance of payment. (Doc. No. 21, at 15.)

Nevertheless, as stated above, the federal rules allow pleading in the alternative and, if the court determines that Zimmer was not acting as an agent of Maritim, she may be liable for the March 3 order of beauty products under a breach of contract theory. Notably, defendants point out that many of the contractual details are vague or simply absent, thereby concealing the

contract's agreeing parties. While it may be true that plaintiff pleaded a much more compelling case for Zimmer acting as Maritim's agent, the federal pleading rules merely require the complaint to raise a plausible inference of liability. As such, Zimmer's motion to dismiss plaintiff's breach of contract claim will be **DENIED**.

### D.) UNJUST ENRICHMENT

Plaintiff raises unjust enrichment claims against both Maritim and Zimmer. To establish a claim for unjust enrichment under Pennsylvania law, a party must show "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." Stoeckinger v. Presidential Financial Corp. of Delaware Valley, 948 A.2d 828, 833 (Pa.Super.Ct. 2008) (quoting Styer v. Hugo, 619 A.2d 347, 350 (Pa.Super.Ct. 1993)). Because the complaint properly alleges that plaintiff conferred a benefit on defendant Maritim or, in the alternative, Zimmer, defendants' motions to dismiss the unjust enrichment claims will be **DENIED**.

*1.) Unjust Enrichment Claim Against Maritim*

In the case of Maritim, plaintiff has stated that it made a shipment of beauty products to the company's Dusseldorf location on March 3, 2008 and that Maritim received and accepted the shipment two weeks later. (Doc. No.

21, at 7.) Maritim does not deny that it received the goods; instead it argues that it already paid Zimmer with the intent that she would transmit payment to plaintiff. (Doc. No. 32, at 21-22.) Maritim's brief states, "[p]laintiff cannot assert a claim for unjust enrichment against Maritim as [p]laintiff avers that Maritim paid [d]efendant Zimmer for the alleged goods and therefore did not receive a benefit for which it would be unconscionable to retain." (Doc. No. 32, at 21-22.) This argument is completely without merit.

One of the purposes of unjust enrichment is to compensate the aggrieved party for the value of goods or services conferred on and unpaid for by the defendant. Curley v. Allstate Ins. Co., 289 F.Supp.2d. 614, 619 (E.D.Pa. 2003) (requiring defendant to compensate plaintiff for "value of benefit conferred."); Sneberger v. BTI Americas, Inc., 98-CV-932, 1998 WL 826992 *9 (E.D.Pa. 1998) ("Unjust enrichment is a quasi-contractual remedy created to compensate the plaintiff where the defendant has received a benefit to which he is not entitled."). In this case, defendant Maritim argues that it did pay for plaintiff's products by paying Zimmer, albeit with the intention that Zimmer would pay plaintiff. (Doc. No. 32, at 28-29.) Neither plaintiff nor defendants argue that Zimmer was an agent of plaintiff or acting on plaintiff's behalf. Rather, plaintiff alleges that Zimmer was Maritim's agent. (Doc. No. 21, 13-14.) Therefore, Zimmer's receipt of the money certainly did not compensate plaintiff unless Zimmer transferred the money

to plaintiff, something plaintiff denies. The remedy of unjust enrichment is not so much to ensure that goods are paid for as it is to ensure that the seller of the goods is paid for them. Here, Maritim may have paid for the products, but if it did not pay plaintiff for the products, plaintiff has properly alleged an unjust enrichment claim. As such, the motion to dismiss the unjust enrichment claim against Maritim is **DENIED**.

*2.) Unjust Enrichment Claim Against Zimmer*

Plaintiff argues in the alternative that defendant Zimmer is liable for unjust enrichment if the court finds that she received possession of the beauty products shipped on March 3. (Doc. No. 21, at 15.) It should be noted that plaintiff primarily argues that it is Maritim, not Zimmer, who is liable for unjust enrichment:

> 60. On or about March 3, 2008, Plaintiff sent from Pennsylvania a shipping container, containing 441 cartons on 8 skids of beauty products (consolidating the products for the 38 Maritim locations, and professional products for the single Maritim location called the Timmenforfer) to Maritim Hotel Dusseldorf, MaritimPlatz 1, Dusseldorf, Germany 40474.
> 62. On or about March 14, 2008, the shipping container, containing 441 cartons on 8 skids of beauty products arrived at, and were accepted by Maritim Hotel Dusseldorf, MaritimPlatz 1, Dusseldorf, Germany 40474. (Doc. No. 21, at 7.)

Furthermore, when Zimmer ordered the beauty products, she was allegedly acting as an agent of Maritim and asked that the products be shipped to Maritim, not her. (Doc. No. 21, at 3,7.) Nevertheless, the federal rules allow for alternative pleading, (Fed.R.Civ.P. 8(d)), and the precise

relationship between Zimmer and Maritim is in dispute in this case. While the complaint alleges that the goods were shipped to a Maritim location, the complaint does not state who ultimately took possession of the goods, thereby unjustly enriching the possessor. As such, at this stage of litigation, defendant Zimmer's motion to dismiss plaintiff's unjust enrichment claim will be **DENIED**.

### E.) CONVERSION

Finally, plaintiff alleges that Zimmer committed the tort of conversion to the extent she withheld from plaintiff Maritim's payment. (Doc. No. 21, at 15.) Defendant Zimmer responds by arguing that money may not be the subject of conversion under these facts and that the conversion claim is barred by the statute of limitations and the gist of the action doctrine. (Doc. No. 23, at 16-19.)

To establish a conversion claim under Pennsylvania law, a party must show a "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." Serafini v. Mariani, 08-CV-569, 2010 WL 1342926, *4 (M.D.Pa. 2010) (quoting Universal Premium Acceptance Corp. v. York Bank & Trust Co., 69 F.3d 695, 704 (3d Cir. 1995). "Money may be the subject of a conversion only where the plaintiff had a property interest in the money at the time of the alleged conversion." Kia v. Imaging Sciences

Intern. Inc., 735 F.Supp.2d 256, 270 (E.D.Pa. 2010); Rahemtulla v. Hassam, 539 F.Supp.2d 755, 777 (M.D.Pa. 2008). The right to payment of money under a contractual agreement does not constitute a property interest for purposes of conversion. Novacare Inc. v. Southern Health Management, 97-CV-5903, 1998 WL 470142, *2-3 (E.D.Pa. Aug. 11, 1998); Duane Morris LLP v. Todi, 2002 WL 31053839, *5 (C.C.P. Sept. 3, 2002).

Here, plaintiff alleges that Maritim paid Zimmer for the March 3 shipment and that Zimmer committed conversion by withholding payment from plaintiff. As noted above, a contractual right to payment does not suffice to create a property interest for purposes of a conversion claim. As such, plaintiff's conversion claim fails insofar as it seeks relief for the withheld payment. Nor can plaintiff bring a conversion claim against Zimmer or Maritim for the goods themselves because a conversion requires a party to deprive a person's right of property without the owner's consent. Serafini v. Mariani, 08-CV-569, 2010 WL 1342926, *4 (M.D.Pa. 2010). Plaintiff alleges that it voluntarily shipped the beauty products to Maritim, so the company's possession of the goods cannot be said to be without plaintiff's consent. As such, defendant Zimmer's motion to dismiss the conversion claim will be **GRANTED**.

**F.) COSTS, INTEREST, COMPENSATORY AND PUNITIVE DAMAGES**

Defendant Maritim moves to dismiss plaintiff's request for costs,

interests, and compensatory and punitive damages. (Doc. No. 32, at 30.) In federal court, costs may be awarded "[u]nless a federal statute, [the Federal Rules], or a court order provides otherwise." Fed.R.Civ.P. 54(d)(1). Defendant has pointed to no exception to this rule, so the court will **DENY** the motion as it related to plaintiff's request for costs of litigation. As for fees, the federal rules require parties to request attorney's fees "by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed.R.Civ.P. 54(d)(2)(A). This is generally requested within 14 days of entry of judgment. Fed.R.Civ.P. 54(d)(2)(B). Therefore, the court will **GRANT** defendants' motion to dismiss attorney's fees without prejudice. Finally, the court will **DENY** defendants' motion to dismiss plaintiff's request for interest because pre-judgment interest awardable as a matter of right in contract actions under Pennsylvania law and post-judgment interest is statutorily mandated for all judgments in federal court. 28 U.S.C. §1961; TIG Ins. Co., 2013 WL 249973, at *31.

As for damages, the court will **DENY** defendants motion for dismissal of compensatory damages because the court has determined that the complaint has stated several claims for which relief can be granted. As far as punitive damages go, the court will **GRANT** the motion because, under Pennsylvania law, punitive damages may not be awarded for breach of contract and unjust enrichment, the only two surviving claims in this case.

In re Beltrami, 324 B.R. 255, 275 (Bankr. M.D.Pa. Apr. 7, 2005) ("The purpose of quasi-contact [sic] is to accomplish restitution, i.e., to place the parties in a status quo as if no unjust enrichment had occurred."); Scott v. Geico General Ins. Co., 11-CV-1790, 2013 WL 3147637, *7 (M.D.Pa. 2013) ("it is well settled that punitive damages are not available in breach of contract actions.") As such, the motion to dismiss plaintiff's request for compensatory damages, interest, and costs will be **DENIED**. However, the motion to dismiss plaintiff's request for attorney's fees is **GRANTED without prejudice** and punitive damages will be **GRANTED**.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE:** July 31, 2013

O:\Mannion\shared\MEMORANDA - DJ\2011 MEMORANDA\11-2379-01.wpd